United States Courts
Southern District of Texas
FILED

SEP 2 4 '

United States Courts
Southern District of Texas David J. Bradley, Clerk of Court
FILED

SEP 24 2019

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| vs. | § | CASE NO. |
| | § | (Crim. No. 4:13-CR-00262-2) |
| CHARLES HARRIS, | § | USM NUMBER: 42637-379 |
| | § | |
| Defendant/Movant. | § | |

## MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY

TO THE HONORABLE NANCY F. ATLAS, SENIOR U.S. DISTRICT JUDGE:

NOW COMES the Defendant/Movant Charles Harris ("Harris") herein appearing in pro se filed with the Honorable Court his Memorandum In Support Of Motion To Vacate, Set Aside, Or Correct A Sentence By A Person In Federal Custody and would argue and state the following:

### REQUEST FOR LIBERAL CONSTRUCTION OF THE PLEADINGS

Mr. Harris request of the Court to liberally construe the pro se pleadings and to not hold him to the stringent standards of those of an attorney. See, Haines v. Kerner, 404 U.S. 519,520, 92 S.Ct. 594, 30 L.Ed. 2d 652 (1972); McNeil v. United States, 508 U.S. 106,113, 113 S.Ct. 1980, 124 L.Ed. 2d 21 (1993).

Courts have held that "a party appearing without counsel is afforded extra leeway in meeting the procedural rules governing litigation," and that district court judges should "make some effort to protect a party so appearing from waiving a right... because of his or her lack of knowledge." Enron Oil Corp. v. Diakuhara, 10 F.3d 90,96 (2nd Cir. 1993).To give such "extra leeway," courts are, for example, to construe a pro se litigant's

1

pleadings more freely, see <u>Holmes v. Goldin</u>, 615 F.2d 83,85 (2nd Cir. 1980); courts should not allow a pro se litigant's rights to "be impaired by harsh application of technical rules," <u>Traguth v. Zuck</u>, 710 F.2d 90,95 (2nd Cir. 1983). Therefore, the district court hereto is requested by Mr. Harris to liberally construe his pro se pleadings and invokes the pendant jurisdiction of the Court pursuant to 28 U.S.C. § 2255.

<u>JURISDICTION</u>

This Court has jurisdiction to consider Mr. Harris' 28 U.S.C. § 2255, because currently he is confined in the Federal Medical Center, Fort Worth, Texas pursuant to a judgment and sentence order dated July 11, 2017. Doc. 145.

Under 28 U.S.C. § 2255, Mr. Harris states under the following the Court has jurisdiction:

(a) a prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Mr. Harris filed a notice of appeal of the sentence imposed, and the United States Court of Appeals, For The Fifth Circuit assigned his appeal Case No. 17-20439. His appellate attorney filed an erroneous Anders brief on or about January 2, 2018. <u>Anders v. California</u>, 386 U.S. 738 (1967).

On June 28, 2018, the Fifth Circuit affirmed Mr. Harris' conviction and sentence. <u>United States v. Charles Harris</u>, 729 Fed. Appx. 336; 2018 U.S. App. LEXIS 17800 (5th Cir. June 28,

2

2018).

<u>Timeliness</u>

Under § 2255(f), Mr. Harris argues he is timely in filing his habeas corpus petition as follows:

(f)   A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1)   the date of which the judgment of conviction becomes final;

The Supreme Court has held that the conviction become final, for purposes of 28 U.S.C. § 2255, when time for filing certiorari petition expires. <u>Clay v. United States</u>, 537 U.S. 522 (2003).

Therefore, Mr. Harris' time for filing his § 2255 expires on September 28, 2019.

Mr. Harris' § 2255 is now timely filed. <u>Id</u>.

## PROCEDURAL HISTORY

Charles Harris was indicted on May 8, 2013, and was arrested on May 14, 2013 by the Federal Bureau of Investigation ("FBI") in Houston, Texas for allegedly healthcare fraud. Mr. Harris and his sister an alleged co-defendant Antonia Harris, engaged in the business of home health care and medical clinic for the benefit of the poor, home-bound, elderly and terminally ill individuals in the Houston, Texas area. Mr. Harris has a master's degree in social work, and Ms. Harris was a registered nurse.

From approximately April 2007 Mr. Harris operated a successful business and assisted thousands of poor and elderly individuals in the Houston area through Harris Healthcare, which was a medical clinic.  In approximately 2010, Dr. Kahn  would

refer some individuals for services by his sister's business, Allied Covenant Home Health, Inc. (Allied). Mr. Harris was not an owner of Allied, as well as he did not manage any of the staff. Two Physicians referred patients for home health care.

In Mr. Harris' clinic, he entered into multiple agreements with license physician's to provide medical care services, since he was not a doctor. Mr. Harris provided social work services and some of the equipment for the poor and elderly to be properly treated in and around the Houston area through licensed physicians.

Several related cases were filed against multiple doctors and healthcare providers, i.e., Kengda Mehta, M.D. (4:14-CR-00193-001); Ronald F. Kahn, M.D. (4:14-CR-000-194-01); Melanie Mencer Parks, M.D. (4:14-CR-00194-002); Mario Bertoni, M.D. (4:14-CR-00194-03) and Edwidge Jacinthe, M.D. (4:14-CR-00194-004). These doctors/physicians were licensed independent 1099 contract physicians with Harris Healthcare. In these contracts Mr. Harris had no medical oversight or management authority over these medical licensed contractors. The physicians provided medical treatment and patient care through their contractors arrangement with Harris Healthcare and the medicare claims that were filed and subsequently some were held to be in non-compliance with federal laws were filed by the contractors, unbeknown to Mr. Harris.

On or about April 14, 2014, Mr. Harris, after being improperly coached and coerced by his trial counsel(s) entered into a plea agreement and plead guilty to conspiracy to commit

4

healthcare fraud as to Count 1 of the indictment.

The Court ordered a Presentence Investigation Report ("PSR"), and while Mr. Harris requested of his trial counsel(s) to objects to the multiple errors in the PSR and the erroneous enhancements, he was denied effective assistance of counsel.

On June 27, 2017, this Honorable Court sentenced Mr. Harris to the maximum sentence allowed by law and under the guidelines to 120 months (10 years) in federal custody, three years of supervised release, plus an illegal joint and severally liability of restitution in the amount of $2,418,902, and a $100.00 special assessment. The Government dismissed the remaining counts of the indictment. Notice of Appeal was timely filed on July 10, 2017 by Mr. Harris via his own handwriting, and not by his ineffective counsel(s).

Mr. Harris was denied effective assistance of counsel on his first direct appeal, and his appeal was dismissed by the appellate court on June 28, 2018.

Therefore, this 28 U.S.C. § 2255 is now timely filed and properly before the Court for full consideration and to Vacate the conviction and sentence imposed due to the magnitude of constitutional violations.

## ISSUES TO BE RAISED

ISSUE NO 1:    **DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.**

ISSUE NO.2:    **DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL PROCEEDINGS.**

ISSUE NO.3:    **THE CASE IS FACTUAL SYNONYMOUS WITH DOCTOR GANJI.**

ISSUE NO.4:    **THE RESTITUTION ORDER IS ILLEGAL**

5

## ARGUMENT AND AUTHORITIES

**ISSUE NO 1:**   **DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.**

**STANDARD TO REVIEW:** Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.821 (1985)(Effective assistance of counsel on first appeal as of right held guaranteed by the process clause of the [Fifth Amendment] to the United States Constitution.

Mr. Harris argues that his appellate counsel, Ms. Georgette Oden, Dallas, Texas filed with the United States Court of Appeals, For The Fifth Circuit an Anders Brief in Case No. 17-20439 on or about January 2, 2018 erroneously alleging that Mr. Harris had no non-frivolous issues or legal question that could be raised. See, Anders v. California, 386 U.S. 738 (1967). See, page 2 of the Anders brief.

However, the appellate counsel failed to discuss the appeal with Mr. Harris in any manner, and merely failed to file the meritable issues as hereto raised. Strickland v. Washington, 466 U.S. 668,688 (1984).

The due process clause of the [Fifth Amendment] guarantees a criminal defendant the effective assistance of counsel on a first appeal as of right; nominal representation on such an appeal does not suffice to render the proceedings constitutionally adequate. Evitts, 469 U.S. at 388-89.

The due process clause and the equal protection clause of the Federal Constitution each triggers a distinct inquiry: due process emphasizes fairness between the [government] and the individual dealing with the [government], regardless of how other individuals in the same situation may be treated; equal

6

protection, on the other hand, emphasizes disparity of treatment
by the [government] between classes of individuals whose
situation are arguably indistinguishable.  Here, Mr. Harris was
represented on appeal by a federal court appointed counsel
pursuant to 18 U.S.C. § 3006A, which failed in her duty of
loyalty, to avoid conflict of interest, to advocate Mr. Harris'
cause, consult with Mr. Harris on important decisions; and failed
to keep Mr. Harris informed of important developments in the
course of the appellate process, and ultimate failed in her duty
to bring to bear such skill and knowledge as will render the
appellate process a reliable adversarial testing process.
Strickland. at 688.

    As will be argued throughout this § 2255, Mr. Harris was
denied effective assistance of counsel on his first direct
appeal, as well as during the trial proceedings.  Mr. Harris will
be quite specific as to the multitude of errors caused by the
appellate counsel, ranging from the failure to argue the illegal
jointly and severally liabilities of restitution, when it is
prima facie and conclusive that Mr. Harris can not be held
jointly and severally liable for restitution in this health care
fraud case. See, Honeycutt v. United States, 137 S.Ct. 1626 (June
5, 2017)(decided prior to Mr. Harris' sentence on June 27, 2017
and prior to his appeal brief filed on January 2, 2018); United
States v. Elbeblawy, 899 F.3d 925,940-41 (11th Cir. 2018).

    In addition, while the issue of ineffective assistance of
counsel is best raised on habeas corpus proceedings.  However the
issues of errors in the Presentence Investigation Report, used to

7

enhance Mr. Harris, induced and coerced guilty plea and plea
waiver, failure to call witnesses in his defense, and failure to
investigate and present evidence on direct appeal are all
non-frivolous issues.

Mr. Harris was denied the right to have effective assistant
of counsel, whether retained or appointed, who plays the role
necessary to insure that the trial proceedings were fair, and
that his appellate proceedings presents non-frivolous issues on
direct appeal. See, Strickland, 466 U.S. at 685.

In this particular appellate proceedings, Mr. Harris'
counsel on appeal merely "did nothing"  - filed an unwarranted
and very prejudicial Anders brief, and then filed a motion to
withdraw, get paid and collect the money without simply providing
effective assistance of counsel. Id. at 686.

The familiar Strickland standard governs claims for
ineffective assistance of appellate counsel. Smith v. Robbins,
528 U.S.259,285 (2000).  In the appellate context, counsel is
deficient if he or she "unreasonably fail[s] to discover
non-frivolous issues and to file a merits brief raising them. Id.
When, Mr. Harris succeeds in showing that counsel was deficient,
"he then has met the burden of demonstrating prejudice. Id.
Under the arguments hereto, Mr. Harris has demonstrated
probability in showing "a reasonable probability that but for his
counsel's unreasonable failure to file a merits brief, he would
have prevailed on his appeal." Id.

The meritable issues are persuasive and prima facie as
argued throughout hereto, in which in a point-by-point basis in this

8

brief, not raising the meritorious issues as argued hereto. See, United States v. Skurdal, 341 F.3d 921,927-28 (9th Cir. 2003)(counsel's failure on appeal to present nonfrivolous issues "supported by citation to the record and to applicable legal authority" was ineffective assistance because defendant was denied Fifth Amendment right to effective assistance of counsel on appeal.) For example, the Honeycutt and Elbeblawy authority as to not being held jointly and severally liable for restitution was an illegal sentence, and should have been raised on the direct appeal; denying Mr. Harris the right to effective assistance of counsel on appeal. Evitts, 469 U.S. at 388-89. Including the other issues as raised hereto. Id.

The meritable issues are persuasive and prima facie as argued throughout hereto. The right to counsel is the right to effective assistance of counsel. Strickland, 466 U.S. at 686.

The denial of the right to effective assistance of counsel has profoundly prejudiced Mr. Harris, and as intertwined hereto, point-by-point, and quite specific (nothing is conclusory), Mr. Harris brings these issues before the Court to make a factual determination on the merits of the argument in this § 2255

ISSUE NO.2:    DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL DURING THE TRIAL PROCEEDINGS.

STANDARD TO REVIEW: Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)("Two part test of effective assistance of defense counsel held (1) reasonably effective assistance and (2) reasonable probability of different result with effective assistance.")

Mr. Harris now point-by-point shall raise the issue of

9

ineffective assistance of counsel, however, the issue will also intertwine with Issue No. 1, denial of the right of effective assistance of counsel on appeal.

**(1)   Counsel Allowed The Court To Impose An Illegal Sentence**

It is prima facie and conclusive that 18 U.S.C. § 1349, conspiracy to common health care fraud as to Count 1, with an alleged offense date of May 8, 2013, in which the Honorable Court imposed a sentence of 120 months as to Count 1, three (3) years of Supervised Release as to Count 1, a special assessment of $100,00, and an **illegal**  restitution order of $2,418,902.05 jointly and severally with an alleged co-defendant was illegally imposed by the Court. See, Doc. 145, filed on June 27, 2017.

In light of Honeycutt v. United States, 137 S.Ct. 1626 (2017), there is no basis for joint and several money judgment as to defendants and Mr. Harris, particularly where Mr. Harris himself faced no such judgment despite being alleged to be one of the principal recipient of any fraud proceeds.  Again, these are allegations, in which Mr. Harris disputes.  Still yet, joint and several liability is an illegal sentence.

Improper joint and several liability under Honeycutt. This Honorable Court imposed a restitution order judgment premised on proceeds received by Mr. Harris violates the Supreme court's holding in Honeycutt v. United States, 137 S.Ct. 1626,1633 (2017), barring joint and several liability that actually shifts the restitution burden from the traceable proceeds to innocent funds.  In this case, there was no showing of the receipt of proceeds in the amount of $2 million plus dollars by Mr. Harris,

and no basis to attribute to him $2 million plus received. Instead by holding Mr. Harris on a joint and several liability basis. The government conceded during the trial proceedings and claimed to have traced no more than approximately $250,000 to Mr. Harris.

However in the rearrangement hearing conducted on April 4, 2014 at page 24, again the Government alleged the joint and severally liability of the $2,318,902.05, which again was illegal under the health care fraud statute. Id.; Elbeblawy, 899 F.3d at 940-941. The Government was not able to trace anything close to $2 million dollars plus to Mr. Harris in proceeds he himself actually received.

As the Supreme Court explained in Honeycutt, where the forfeiture statute reaches only forfeitable property obtained directly or indirectly from a crime, joint and several liability is improper and the actual forfeitable property received by the defendant forms the limit of the forfeiture. 137 S.Ct. at 1633. Because the restitution judgment in this case directly conflicts with Honeycutt and implicitly overrules prior decisions of Court's - such as United States v. Hoffman-Vaile, 568 F.3d 1335, 1344-46 (11th Cir. 2009) - it must be Vacated.

The same reasoning applies to health care fraud cases statute. Honeycutt, at 940-41.  As the Fifth Circuit has explained neither the drug or health care fraud statutes provides for joint and several liability, and the health care statute that Mr. Harris was sentence under - reaches only property traceable to the commission of an offense caused by Mr. Harris himself.

11

See, <u>United States v. Sanjar,</u> 878 F.3d 725,749 (5th Cir. 2017).

The health care fraud statute of 18 U.S.C. § 1349 was in existence when Mr. Harris was sentenced, therefore his trial counsel(s) should have known that he could never he held accountable under joint and several liability for restitution. <u>Strickland</u> , 466 U.S. at 692.  In addition, his appellate counsel was ineffective for failing to raise this issue on Mr. Harris' direct appeal. <u>Id</u>.

This Court has imposed an illegal sentence on Mr. Harris, and it was caused through and in conjunction with ineffective assistance of counsel. <u>Id</u>.  That a person who happens to be a lawyer is present at the trial proceedings alongside Mr. Harris is not enough to satisfy the Sixth Amendment; Mr. Harris is entitled to be assisted by an attorney, whether retained or appointed who plays the role necessary to insure that the trial proceedings and sentencing is fair. <u>Id</u>. at 685.

To allow Mr. Harris to be sentenced to an illegal sentence, commands this Court to hold his trial counsel(s) as totally ineffective, and even the Government will concede this fact. <u>Id</u>. at 684.  Counsel can deprive Mr. Harris of effective assistance of counsel, simply by failing to do anything (as is what occurred here) and rendering inadequate assistance of counsel. <u>Id</u>. at 686.

The Government may attempt to argue that <u>Honeycutt</u>'s holding and reasoning are restricted, however it is not because it holding and reasoning are not restricted to forfeiture orders under 21 U.S.C. § 853(a)(1). Shortly after the decision, the Supreme Court, vacated and remanded an appeal from the Third

12

Circuit affirming a forfeiture money judgment under 18 U.S.C. §§ 981(a)(1)(C) and § 982(a)(2), and 28 U.S.C. § 2461 for further consideration in light of Honeycutt. See, Brown v. United States, No. 16-7794, 2017 WL 553853 (U.S. June 12, 2017).

Still yet, under Sanjar, the Fifth Circuit has made this issue crystal clear. There can be no joint and several liability under the health care fraud statute. 878 F.3d at 749. See 18 U.S.C. § 982(a)(7).

The healthcare fraud statute does not permit joint and several liability for restitution and forfeiture. Elbeblawy, at 941; Sanjar, at 749.

All counsel(s) had to do was read the statute and penalty provisions, and joint and several liability can not be imposed against Mr. Harris. He was denied effective assistance of counsel(s). Strickland, 466 U.S. at 686,602. He was denied effective assistance of counsel on appeal. Id.; Evitts, 469 U.S. at 388-89.

**(2) Plea Waiver Does Not Prevent Mr. Harris From Raising His Ineffective Assistance of Counsel Claims.**

It is prima facie and conclusive that Mr. Harris was entitled to an appeal. However his appellate counsel filed an erroneous Anders brief.

It is well settled law that plea waiver's may waive most constitutional challenges. See, Tollett v. Henderson, 411 U.S. 258,267 (1975). It usually does not waive a claim of double jeopardy. Menna v. New York, 423 U.S. 61,62-63 & n.2 (1975).

In Class v. United States, 583 U.S. 798 (2018), the Supreme Court upheld the "Menna-Blackledge doctrine's basic teaching that

13

'a plea of guilty to a charge does not waive a claim that

-judged on its face- the charge is one which the State may not

constitutionally prosecute.'" (citing United States v Broce, 488

U.S. 563, 575 (1984). The United States cannot hold Mr. Harris

jointly and severally liable, it is beyond that which congress

expressly authorized in 18 U.S.C. § 982 (a)(7), and no plea

agreement or plea waiver can in any way obstruct Mr. Harris from

the prejudice of the United States usurpation of statutory

authority and subversion of due process. (emphasis supplied). Mr.

Harris' appellate counsel is ineffective for filing an Anders

brief when well settled Supreme Court precedence authorizes Mr.

Harris to raise a claim of Constitutional dimension.

An appeal waiver does not bar a defendant from raising a

claim of ineffective assistance of counsel. See United States v

White, 307 F.3d 336, 339 (5th Cir. 2002)(The defendant may always

avoid a waiver on the limited grounds that the waiver of appeal

itself was tainted by the ineffective assistance of counsel). Mr.

Harris' counsel was ineffective for allowing him to enter into a

plea agreement that is in violation of Statute. The professional

norm requires an attorney to investigate the laws and facts

as they relate to the case before a strategic decision can be

made. See Strickland at 690. Counsel's decision not to apply the

law is inherently unreasonable.

Ultimately, as the Supreme Court has explicitly held the plea

waiver argument in the context of ineffective assistance of

counsel claims are ripe in § 2255 proceedings.  Yet, the Supreme

Court has long recognized that a defendant, such as Mr. Harris,

14

can undo a guilty plea by showing that ineffective assistance caused him to make that decision rather than proceed to trial. In this instant case Mr. Harris received the maximum sentence allowed by law (120 months)) and this illegal restitution of $2 plus million dollars. See, Hill v. Lockhart, 474 U.S. 52,56-57 (1985).

The sister circuit, the Eleventh Circuit has also consistently held that for Mr. Harris to obtain relief, he must prove "serious derelictions on the part of counsel sufficient to show that his plea and plea waiver was not, after all, a knowing and intelligent act." See, Downs-Morgan v. United States, 765 F.2d 1534,1539 (11th Cir. 1985)(quoting McMann v. Richardson, 397 U.S. 759 (1970). Here, as will be argued throughout this § 2255, in an intertwining manner, Mr. Harris has been substantially prejudiced. He was coerced and coached to plead guilty, unintelligently knowing that his sentence would be the maximum allowed by statute for this first time defendant; and, that his restitution/forfeiture order of $2 million plus was illegal. This violated both his Fifth and Sixth Amendment Constitutional Rights.

Some courts have taken the view that a failure to disclose exculpatory evidence renders the plea unknowing and involuntary. Sanchez v. United States, 50 F.3d 1448,1453 (9th Cir. 1995); United States v. Fisher, 711 F.3d 460 (4th Cir. 2013). Here, Mr. Harris received 120 months maximum sentence, while his sister received 3-years and made a deal with the government. Mr. Harris was not privy to the deal his sister made, and that

15

exculpatory evidence was withheld from Mr. Harris (in that she agreed to testify for the government and provide evidence for a 3 years deal). As well as ineffective assistance of counsel for the failure to investigate and seek further information from the government through discovery. United States v. Lampazianie, 251 F.3d 519,527 (5th Cir. 2001).

This case has a myriad of errors, which substantiates ineffective assistance of counsel, and no plea waiver will cause this Court to strike Mr. Harris' claims for ineffective assistance of counsel. White, 307 F.3d at 339.

Historically, every circuit court has held that a plea waiver and/or ineffective assistance of counsel does not deny a [defendant] such as Mr. Harris to raise the issue of ineffective assistance of counsel in a collateral proceeding. See, e.g. Cullen v. Pinholster, 563 U.S. 170,202 (2011); Glover v. United States, 531 U.S. 198,201,204 (2001); Kovacs v. United States, 744 F.3d 44,52 (2nd Cir. 2014); United States v. Juarez, 672 F.3d 381,388-99 (5th Cir. 2012); Phillips v. White, 851 F.3d 567,582-83 (6th Cir. 2017); Weeden v. Johnson. 854 F.3d 1063,1071-72 (9th Cir. 2011); Heard v. Addison, 728 F.3d 1170,1185-85 (10th Cir. 2013).

Plus, as the Fifth Circuit has established that when an issue of insufficient factual basis for the plea is obtained through ineffective assistance of counsel, the plea waiver also does not prevent Mr. Harris from raising this issue in a collateral attack. See, e.g., United States v. Hilderbrand., 527 F.3d 466,474 (5th Cir. 2008).

16

For these reasons, Mr. Harris' plea waiver does not prevent him from raising his Fifth and Sixth Amendment claims caused by ineffective assistance of counsel.

**(3)   Mr. Harris Was Denied Effective Assistance Of Counsel Through the Coerced and Coached Guilty Plea.**

In conjunction and intertwined with issues raised in this § 2255, Mr. Harris profoundly states that he was coached and coerced to plead guilty by his trial counsel(s).  Mr. Harris was advised by his trial counsel(s) that if he plead guilty that he would receive a substantial departure and possibly probation.

The benchmark for judging any claims of the effectiveness of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland, 466 U.S. at 686.  Here, Mr. Harris' counsel coerced him into pleading guilty, by stating that this matter would result in a downward departure, and should very likely encompass probation.  Mr. Harris, while being advised that the maximum sentence that he could receive was 120 months (10 years) under the statute. But, his attorney(s) stated that based upon his criminal history, role in the offense, and assistance to the Government – he would receive a sentence more than likely of probation, and no where near 120 months. Id.

The proper standard for attorney's performance is that of reasonably effective assistance when a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing norms. Id. at 687.

17

**(3)  Mr. Harris' Guilty Plea Was Obtained Through Coercion,
       Threat and Promise**

Mr. Harris trial counsel's made substantial promises to
him to obtain his guilty plea.  The counsel(s) promises that
Mr. Harris would be placed under the Sentencing Guidelines
framework of Zone A of 0 through 6 months, and that he would
receive probation.

It is well settled law that the constitution requires
that Mr. Harris's plea be made voluntarily, knowingly to and
intelligently. Brady v. United States, 397 U.S. 742,750
(1970); Corbitt v. N.J., 439 U.S. 212,218-19 (1978).

The key issue in this instant case is that Mr. Harris'
counsel(s) promised him that he would receive a plea deal,
and that he would receive a sentence of probation and home
confinement. Strickland, 466 U.S. at 687,692.

However, they also advised Mr. Harris to fabricate some
information and provide it to the government,  Therefore,
the trial counsel(s) were faced with a direct conflict of
interest. United States v. Cronic, 466 U.S. 648 (194).
Plus, counsel has a duty to his client of loyalty and to
avoid conflict of interest. Strickland, 466 U.S. at 688.

Therefore, Mr. Harris' plea was based upon some
condition, and a conditional plea can be withdrawn when it
was obtained through a promise and/or coercion by his trial
counsel(s). See, United States v. Molina-Gomez, 781 F.3d
13,24-25 (1st Cir. 2015).

During lengthy discussions with his trial counsel(s),
Mr. Harris was advise - "just tell them you signed the

18

documents." You need to advise them of this for us to
complete the deal with the Government, which was probation
and home confinement. Strickland, 466 U.S. at 688. So, Mr.
Harris commenced to make up thing and provide them to the
Government, however because Mr. Harris has no knowledge of
the alleged conspiracy to commit health care fraud, his
information to the Government was limited. When the
Government became aware that Mr. Harris had no knowledge of
what was going on, they became irate, as the sentencing
transcript fully supports. The Government decided to "slam"
Mr. Harris with the maximum sentence they could impose of
120 months (10 years). (Emphasis Supplied).

Advising a client to mislead investigators is not an
exercise of reasonable professional judgment. Mr. Harris'
counsel(s) advised him to mislead prosecutors, direct
valuable -yet limited- government resources down a dead end
path. But for counsel(s) unprofessional judgment Mr. Harris
would more than likely would have received a lower sentence.

In Nix v. Whiteside, 475 U.S. 157, 175 (1986), the
Court found that although the proceedings would have had a
different outcome a defendant has no right to testify
falsely against counsel's direction. In the present case,
however, Counsel advised Mr. Harris to provide false
information in order that he may receive a below guideline
sentence. Counsel(s) advise deprived Mr. Harris of a fair
and reliable outcome and did not advance the proper role of
justice.

The proper standard for attorney performance is that of reasonably effective assistance; when Mr. Harris complains of the ineffectiveness of counsel's assistance, Mr. Harris must show that counsel's representation fell below am objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687. When counsel(s) advised Mr. Harris to just tell them you signed the documents, fabricate something, this placed Mr. Harris in a position of not intelligently and/or voluntarily pleading guilty. Because, he was expecting the plea deal of probation and home confinement, just to provide the Government something. Mr. Harris being a first time offender, never being in trouble before, was a layman to the inner workings of the law, and needed the guided hand, skills and knowledge of his attorney(s) to assist him in these criminal proceedings. Id. at 584.

The coercion is quite obvious, when you advise a client – tell them you signed the documents – there is a plea deal on the table of probation and home confinement. Mr. Harris followed their instructions. (Emphasis Supplied). See, United States v. Bui, 795 F.3d 363367-368 (3rd Cir. 2015)(plea not voluntarily because defendant relied on counsel's incorrect advice regarding availability of reduced sentence). This is exactly what occurred in this instant case.

When it became aware that the information that Mr. Harris was providing to the Government, they were not

20

satisfied with.   The Government became quite angry and even
called Mr. Harris a liar.  Mr. Harris directs the Court to
the following:

MR. CUNNINGHAM:    you know. And immediately before
his plea, Charles Harris starting cooperating, and for a
long time it was going very well, very well, and I believe
the Government was happy with it. Then he made some
statements in the course of the investigation, and the
Government has, as their right, called off the cooperating
deal. They were frustrated and angry, and understandably so.
I mean, they exerted their rights, their prerogative under
the Plea Agreement. Doc. 170, p. 9-10.   It is noted that
while the counsel(s) advised Mr. Harris what to say, once
the Government got angry, he was left on an island alone.

But Mr. Harris did make a good faith effort to
cooperate on a number of doctors (alleged co-defendants from
information he gathered through his association with his
sister). It's tragic that something that was going that well
-- and that's my perception -- ends up with a PSI looking
like this. Doc. 170, p. 10.  What counsel failed to state to
the Court, was that Mr. Harris was following his
"instruction" to lie to the verbatim and what he was told to
do and say. (Emphasis Supplied). Cronic, supra; Cuyler v.
Sullivan, 446 U.S. 335,350 (1980),  and Strickland, at 687.

Mr. Harris met with his counsel(s) on various
occasions, and they threaten him, because Mr. Harris wanted
to withdraw his plea (because it appeared the Government was

21

upset) and the probation and home confinement deal was going
array. His counsel(s) advised him that they would seek the
downward departure, and his sentence would be probation and
home confinement. Yet, in the same vain, when Mr. Harris,
his counsel and the prosecutor were together. His counsel
stated, well let's move forward with this case (Mr. Harris),
and let's make a deal on another case (apparently Dr. Kahn
and Ms. Antonia Harris) giving Mr. Harris up for another
client. Cronic, 466 U.S. at 648,656-57,661; Cuyler, 446 U.S.
at 350.. This is an actual conflict of interest, as counsel
then became an advocate for the government, and not his
client. Id. More convincing is that the attorneys worked
together on all these cases, which is most definitely a
conflict of interest. Id.

To meet the demands of the Fifth and Sixth Amendment,
Mr. Harris was denied his Constitutional safeguards. His
plea was not knowingly, voluntarily, and intelligently
entered and accepted by this Honorable Court. Ultimately,
he was denied effective assistance of counsel. In
representing Mr. Harris, counsel(s) owes him a duty of
loyalty, a duty to avoid conflicts of interest, a duty to
advocate his cause, a duty to consult with Mr. Harris on
important decisions, a duty to keep Mr. Harris informed of
important developments in the course of the prosecution, and
a duty to bring to bear such skills and knowledge as will
render the trial a reliable adversarial testing process.
Stricklamd, 466 U.S. at 688. Mr. Harris was denied the right

to effective assistance of counsel.  He also was denied the right to a knowing, voluntary and intelligent plea. (Emphasis Supplied).

In addition, this matter should have been raised on his direct appeal, that his plea was not knowing, voluntary and intelligent. Evitts, supra.

**(4)  Mr. Harris Was Denied The Right To Effective Assistance Of Counsel When They Failed To Investigate.**

That Counsel(s) advised Mr. Harris to lie about the conspiracy he was not apart of or privy to in order to receive a reduced sentence. Mr. Harris was not apart of the alleged conspiracy. FBI interviews of witnesses support this claim. See, Exhibit 1. Mr. Harris had nothing to do with the conspiracy or at the very least unequivocally show that Mr. Harris was not the leader/organizer of the conspiracy. Counsel(s) can be seen as ineffective for failing to investigate facts and law as they applied to this case. Id at 690.

Counsel has a duty to make reasonable investigations. Id.  The FBI reports in this case combat Mr. Harris' involvement in Antonia Harris' medicare fraud. Joseph Millet and his wife caused the initiation of a FBI investigation. Millet believed that Antonia Harris was committing fraudulent  activities and confronted her. Antonia Harris advised him that it was not illegal to give patients incentives that "would never be able to [be] tracked." Exhibit 1 p.  6. Afterward, Antonia Harris became hostile and angry toward Millet. Id. Millet became "scared" after

23

learning that Antonia had taken out a $1,000,000 life insurance policy on him and his wife. _Id_. Millet then contacted the FBI.

Toward the end of his employment, Antonia Harris advised Millet and others to "'beef up' the 485s and add services that were not medically necessary." _Id_ at 4. Millet did not even meet Mr. Harris until Mr. Harris moved to Allied's space. Millet speculates that Mr. Harris was involved because of "closed door meetings with [Antonia] Harris from time to time. _Id_. Counsel(s) were ineffective for failing to investigate into the basis of the meetings.

Carolyn Harden told investigators she "never sent someone to [Harris Health Care] unless there was a need." Exhibit 2, p. 1. This was crucial evidence, and the failure to investigate prejudiced Mr. Harris. _Id_.

The failure to investigate evidence linking Antonia Harris and Dr. Kahn, the culprits in this health care fraud case, crucified Mr. Harris. See Jury trial testimony of Doc 348, p.177 to 231   Dr. Kahn's trial. _Hernandez v. United States_, 888 F.3d 219,222 (5th Cir. 2018)(conviction set aside because of her counsel's ineffective assistance and resulting prejudice in the failure to investigate); _Rhodes v. Vannoy_, 751 Fed. App. 524,525-532 (5th Cir. 2018)(conviction vacated for ineffective assistance of counsel because counsel failed to investigate).

In Dr. Kahn trial. Antonia Harris testified she broke the rules of Medicare. _Id_ at p. 177.  That Dr. Kahn sign

plans of care, as well as was the medical director for
Allied. Id. at p.368,   Antonia needed a doctor, and she
needed Dr. Kahn to bill medicare. Id. at 10.

It is noted that Harris Health Care was only able to
bill Medicare through Part B.  Allied and Dr.  Kahn bill
medicare through Part A and Dr. Kahn approved everything
that Allied sent to him to sign. Id. at 11.

In Ms. Harris' testimony before the Court in Dr. Kahn's
case, she admitted she was sole owner of Allied, and was
responsible for the day-to-day operations. Id.at p.178.

Mr. Harris was denied effective assistance of counsel,
because Antonia Harris was sentenced to 3 years
imprisonment, in which she was the principal of the
conspiracy (as substantiated by her testimony in Dr. Kahn's
trial.) Mr. Harris received 10 years, and his plea agreement
was not honored (because his knowledge of the overt acts
were minimal) and the Government became angry when all he
could offer (other than the lies coerced by his attorney(s))
to offer to the Government. Giglio v. United States, 405
U.S. 105 (1972).

It is profoundly argued that Ms. Harris failed to
advise the Court that she obtained a deal for her
cooperation. Id.  Further, Mr. Harris was prejudiced by her
deal, because he did not have the knowledge of the
conspiracy that she had, and the Government "balked" from
the information he provided (some was true and some was led
to fabricate by his attorney(s). On page 184 of Doc. 348 of

25

Dr. Kahn's trial, Ms. Harris clearly states:

    MS. McFARLANE:    Do you hope to receive a lighter sentence for testifying?

ANTONIA HARRIS:    Yes.

    Ms. Harris received a 3 year sentence, and Charles Harris received a 10 year sentence.

    Ms. Harris went further in lying as follows:

MS. McFARLANE: Has anyone made you any promise about your testimony here today?

ANTONIA HARRIS:    No. Doc. 380, p.184.

    Further, the failure to investigate that Charles Harris sent patient to Allied to make a factual determination, because he was not a license provider - his company merely made referrals for doctors and companies like Allied to make the final decision.  This was established in Dr. Kahn's trial through Antonia Harris testimony as follows:

MS. McFARLANE: Did you think at the time these patients from Harris Healthcare that Charles Harris sent you actually qualified?

ANTONIA HARRIS: No, not always.

MS. McFARLANE: Some qualified, some didn't?

ANTONIA HARRIS: Yeah.

    This colloquially is significant and undermines the statements that Joseph Millet made that initiated this investigation. See Exhibit 1, p. 4 ("[Antonia] Harris started to encourage the RNs to put that all patients needed social work, although according to MILLET's assessment not

all patients needed it...if social work was not added to the
patient assessment, [Antonia] Harris would add it after her
review without a visit to the patient. Harris had everyone's
log-in and password..." The government knew that Antonia was
committing perjury yet did nothing to stop it. See Napue v.
Illinois, 360 U.S. 264 (1959)(Due process violation when
AUSA allows perjury to go uncorrected.)

Mr. Harris has no knowledge of these criminal acts, and
was not involved.  Harris' company simply made a
professional referral for an assessment.  Once the referral
was made (remember Harris was a social worker, and used
contract physicians to assist in his business) Harris was
not involved in the final analysis and/or service plan of
care; or for that matter any billing to medicare. (Emphasis
Supplied).

This easily could have been investigated by Mr. Harris'
trial counsel(s). Hernandez, 888 F.3d at 222. That an
attorney that happens to be an attorney is present alongside
Mr. Harris during the district court proceedings is not
enough to satisfy the Sixth Amendment; Mr. Harris is
entitled to be assisted by an attorney, whether retained or
appointed, who plays the role necessary to insure that the
trial proceedings are fair. Strickland, 466 U.S. at 685.  In
this instant case, as Mr. Harris advised his counsel(s) the
manner in which he made referrals to Allied, and the manner
in which he contracted with physicians; and his reliance on
the doctors professional judgment in establishing plans of

27

care for patients. This would have established Mr Harris'
total innocence's. Yet, his trial counsel(s) in making
deals for other clients, and tossing Mr. Harris under the
bus, caused the coerced and coached guilty plea with a
promise of probation and home confinement. Id. at 692. Mr.
Harris was charged with health care fraud, even though he
was not a health care provider. Therefore, the failure to
investigate the alleged involvement was crucial and very
prejudicial. For example, Mr. Harris has contractual
arrangements with physicians, who made the medical protocol
care plans (Mr. Harris would not know if they were right or
wrong). (Emphasis Supplied).

The counsel(s) failed to follow the money trail of this
alleged conspiracy. Mr. Harris did not and never received
$2 million plus in medicare payments. Strickland, 466 U.S.
at 688.

Further, the marketing services that Mr. Harris
provided for Allied. Still yet, he had no knowledge of the
medical plan of care finalized by Allied or the contractual
physicians. Look at it this way, a person complains that
they have a medical issue, or come to Harris' clinic and
state they had a medical issue. Mr. Harris and/or his
agents would refer the patient and receive a referral
marketing fee. The "final" plan of care was established by
Allied and/or a contractual physician. The Government
attempted to stretch this to conspiracy to commit medicare
fraud. Mr. Harris does not have a clue how he was drawn to

medicare fraud, simply by referring patients to his sister. This is like Ford Motor Company referring clients to Ford Motor Credit.  Is this illegal?

Now as to the gift card matter.  Mr. Harris instituted gifts cards for the elderly in the community, to assist them with travel, food, clothing, and allow them to come to his place of business to socialize.  This was his way of giving back to the community.  Ms. Harris decided it was a great ideal and started using some of Harris' gift cards in her business.  Harris had no knowledge that she may have been using his gift cards in some inappropriate manner.  This could have easily been established by conducting limited investigation.  Rhodes, 751 Fed. App. at 525-532; Strickland, 466 U.S. at 688

Mr. Harris was denied effective assistance of counsel at every level, especially in the denial and failure to conduct any investigation.

**(5)  Mr. Harris Was Denied Effective Assistance Of Counsel At Sentencing.**

The sentencing errors should also have been raised on direct appeal. Evitts, supra.

Point by point, Mr. Harris will establish the sentencing errors caused by his counsel(s) as follows:

1.    Counsel failed to object to the erroneous assessment of Mr. Harris as a leader and organizer of the conspiracy.

2.   Counsel failed to object that Mr. Harris managed and/or supervised five or more people in the conspiracy.

Who are these five people? This enhancement is not supported by credible evidence.

3.    Failed to object to the Presentence Investigation Report, with the erroneous enhancement under U.S.S.G. § 3B1.1(a).

4.    Failed to object to the gross disparity in sentencing.  Harris received 120 months and plead guilty after being coerced.  Antonia Harris received 3 years.  The doctors in the case also received 1/3 or less of the sentence imposed on Mr. Harris. See, Gall v. United States, 552 U.S. 38,50 (2007).

5.    Failed to file an objection to the severe enhancements under role in the offense.  Especially, when the PSI clearly held that Antonia Harris was the only associate of Mr. Harris.

6.    Failed to object to any alleged enhancements under medicare billing, when it is prima facie and conclusive that Antonia Harris did the medicare billing and her company received the payment - not Charles Harris.  Any payments received by Charles Harris was for his referral services only.  Therefore, the principal, leader and organizer of the medicare billing was Allied (Antonia Harris, by and through several physicians).  Charles Harris' role was merely a referral marketing person, whom happened to be Ms. Harris' unaware brother. In fact, Mr. Harris does not meet any of the criteria under the 4-level enhancement for leader, organizer and manager. (§ 3B1.1(a).

None of the 302s referred to Mr. Harris as a leader, organizer or manager of this alleged conspiracy. Ms. Harris was the sole owner of Allied. Charles Harris was a marketer and social worker. The occupation of office space within Allied, is like Ford Motor Credit occupying office space within a dealership. The dealership markets the vehicle, and the credit company finances the sell. Charles Harris would from time to time market potential patients, but Allied and the contractual physicians would design the medical plan of care.

7.   Failed to profoundly object to the offense conduct within the PSI, that erroneously held Charles Harris as the principle, and alleged that he was the mastermind behind the alleged conspiracy. See, Exhibit 4.

8.   Ultimately, at sentencing the counsel(s) failed to advise the court that Mr. Harris' debriefing to the Government and it contents were at their directions as argued above.

9.   Failed to object to the loss amount, in which caused Mr. Harris' sentencing guidelines to be wrongly inflated.

10.  Failed to object to the Government's assertions of the maximum sentence allowed under the law of 10 years, when counsel(s) knew full well that Mr. Harris only involvement was as a marketing person.

The sentencing transcript shows the prejudice(s) caused by these errors as argued above. Counsel merely stood by an

31

let Mr. Harris be lynched, and imposed a sentence grossly in disparity to other more culpable alleged co-defendants.

As to the 18 U.S.C. § 3553 factors, Mr. Harris has no criminal history. He was a pillar within the community, assisting the elderly and youth throughout. His only role in this alleged conspiracy was as a brother marketing for his sister's business.  Any brother would do that!  The Court based it's 120 months sentence on the erroneous sentencing guidelines, and the Government's request for the maximum sentence allowed, because they assumed that Mr. Harris lied to them in debriefing and breached the plea deal.  Which, as argued above was orchestrated to "tell them something" by his counsel(s).

Mr. Harris was denied effective assistance of counsel during the sentencing phase of the district court proceedings. <u>Strickland</u>, 466 U.S. at 692.  In fact, this was simply nothing but a high staked lynching.

Nothing leads to such a harsh and disparity sentence of 120 months.  In fact, Mr. Harris received the harshest sentence imposed to all alleged co-defendants, and received the less money for his marketing services. (Emphasis Supplied).

**ISSUE NO. 3:**    **THE CASE IS FACTUALLY SYNONYMOUS WITH DOCTOR GANJI**

This issues also should have been raised on direct appeal. <u>Evitts</u>,  supra

The Fifth Circuit in a recent decision on January 30, 2018 in the matter of <u>United States v. Doctor Pramela</u>

Ganji, Case No. 16-31119, 880 F.3d 760 (5th Cir. 2018). In
the Ganji case, Christian Home Health Care ("Christian") was
a home health agency owned by Elaine Davis and her husband,
Walter Davis, Sr. since 1989. Christian provided home health
care services to patients in Southern Louisiana. Home health
care services are those skilled nursing or therapy provided
to individuals who have difficulty leaving the home without
assistance.  These services are commonly provided to senior
citizens.

The process for receiving home health care services
begins when a physician identifies a patient as an eligible
candidate. Usually, although not a legal requirement, a
patient's primary care physician ("PCP") refers him or her
for homehealth services. Then a nurse goes to the patient's
home to assess if he or she is homebound, completing an
Outcome and Assessment Information Set ("OASIS"). The nurse
that develops a plan of care based on the OASIS and forwards
that document to a physician for approval. In 2011,
Medicare implemented a face-to-face requirement to further
ensure that medical professionals would not order home
health care without ever seeing the patient. This requires
medical professionals to actually see the patient for the
initial meeting, but "[t]he face-to-face patient encounter
may occur through telehealth in person." Regulations allow
for medical professionals who are not physicians to complete
the face-to-face encounter, but the professionals have to be
under the supervision of a physician.

33

Charles Harris is a social worker, not a medical professional. He had no manner of instituting medicare billing. He was not a license medical provider.

Under 18 U.S.C. § 3147 - Health Care Fraud, the statute states:

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice -

(1) to defraud any health care benefit programs; or (2) to obtain, by means of false or fraudulent pretenses, representations, or premises, any of the money or property owned by, or under the custody or control of, any health care benefit program:

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both....

(b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section. This section is similar to the statute in <u>Johnson v. United States</u>, 133 S.Ct. 2551 (2015) and should be void for vagueness.

As in <u>Ganji</u>, the Government relies solely on inference to support the alleged fraud charge and the attempted to use those same inferences to support a larger agreement. Mr. Harris has no knowledge or control over medicare billing, any face-to-face encounters, or the physician protocol and manner of assigning patient care plan. Plus, he has no

34

manner in which to bill for Allied's patients.

Similar to Christian hiring Dr. Ganji to become the medical director, Mr. Harris was provided a fee for marketing services to Allied. See, <u>Ganji</u>, 880 F.3d at 764. Ganji entered into a colloborative agreement with nurses to provide the initial face-to-face encounter.  Here, Mr. Harris was provided a fee <u>only</u> for referring patients, he had no knowledge of the patient medical care treatment plan or if they did not need medical treatment at all. <u>Id</u>. at 765.

Similar to <u>Ganji</u>, most of the case against Charles Harris hinged on cooperating witnesses. <u>Id</u>. at 766.  Nothing personally linked Charles Harris to Allied's medicare billing scheme.  What is so troubling, is that Mr. Harris was forced to plead guilty to assuming probation and home confinement, to not have to testify against his sister. Because, Mr. Harris knew he had not filed  fraudulent billing to medicare, and his sister owned and operated Allied, which the Government stated filed in excess of $8 million and received payment for $2 million in fraudulent billing through approvals from contractual physicians. Again, follow the money trail, because Charles Harris only received payments for his marketing services.  Allied and Antonia Harris received payments for the fraudulent billing. <u>Id</u>. Mere association is not a finding of guilt, it must be more. <u>Id</u>. at 768. .

Dr. Ganji argued that the evidence was insufficient to

35

sustain a conviction of conspiracy to commit health care fraud because there was no agreement to defraud Medicare. Id.  Mr. Harris argues that absent his coerced and coached guilty plea, there is no evidence linking him to this alleged conspiracy.  Dr. Ganji received $1,000 a month check.  Mr. Harris received a referral fee from Allied. Id.

Conspiracy is the agreement to join a common scheme  to commit an unlawful goal. Id. (citing omitted).  [T]he agreement must be a criminal act. Id. (citation omitted). Conspirators do not enter into an agreement by happenstance, and because an agreement is the essential element of conspiracy, an agreement commit a crime cannot be lightly inferred. Id. (citation omitted). "Each party must have intended to enter into the agreement and the scheme must have had a common intent to commit an unlawful act." Id. (citation omitted).

Here, as in Ganji, Mr. Harris merely made referrals, did no billing, and had no intent to conduct an unlawful act (his coerced guilty plea was the basis of receiving probation and not tossing his sister to the wolves).  It is obvious, if Allied unlawfully billed Medicare, his sister did it.  Mr. Harris does not need to apply his master's degree to understand that.

Here, Mr. Harris did not receive substantial money from the $2 million plus receipt of the fraudulent billing from Allied.  Basically, like Ganji, Mr. Harris just received his normal pay  (Emphasis Supplied) Id. at 769.  Nor, was Mr.

36

Harris involved with the significant people involved in the Allied and physician fraudulent acts. Id.

There is absolutely no evidence that Mr. Harris forged any patient care plan and invoiced medicare. Identical to Dr. Ganji's case, the evidence is simply missing to support medicare fraud.

The quality and probative strength (excluding the coerced and coached and threaten plea) of the Government's "concerted action" evidence in this case, like in Ganji, falls well short of the threshold United States v. Arredondo-Morales, 524 F.2d 681 (5th Cir. 1980). and United States v. Grant, 683 F.3d 639 (5th Cir. 2012), and now Ganji, 880 F.3d 760 (5th Cir. 2018). Doctors and nurses who were previously associated with Christian spoke of their own fraudulent actions, but they never spoke or testified that they agreed with Dr. Ganji or Davis to carry out these activities. As is here, Antonia Harris, Dr. Kahn, Dr. Mencer, Dr. Bertoni, and Dr. Jacinthe never testified that Charles Harris was involved in a medicare fraud conspiracy. (Emphasis Supplied). There was testimony of Mr. Harris giving gift cards, however that was his standard operative practices is assisting the elderly, homeless, and the youth in need.

Mr. Harris went through great lengths to determine that by Harris requested an opinion from his attorney, Mr. Luis J. Acevedo of Troy Brooks & Associates to review the proposed agreement between Gulf Coast Community Services Association

37

and Harris for Senior Program.  Mr. Harris wanted to assure
that at all times his business was operating within the
parameters and guidelines, and the law of any senior care
programs.  His attorney provided him with sincere and legal
feedback, and all of Harris' contracts and agreements
entered into were developed based upon this legal advice.
See, Exhibit 3.  Again Mr. Harris is not a medical services
provider, and his business was social services.  He relied
on physicians and health care professionals to provide
services in the legal and appropriate manner.  See, Ganji.
880 F.3d at 770.

Similarly to Dr. Ganji, Mr. Harris' business for years
provided services, and at no time did the Government alleged
that Charles Harris' business operated illegally.  It was
that Allied fraudulently invoiced Medicare for over $8
million and collected closed to $2 million in fraudulent
claims. Id, at 771.  Charles Harris is not a medical
provider, this is profoundly important.  While, he took
great caution by hiring an attorney to assure that his
contracts were above board, legal, and placed his company at
no risk. (Ex.3).  The intent to defraud is not accomplished
by the Government's evidence (other than the coerced,
coached and threatened plea and plea agreement, based on a
promise of probation and home confinement, and he would not
have to toss his sister to the wolves).  Mr. Harris just
became affiliates with his sister's business through
referrals and marketing. Id. at 773.

This case is factually synonymous with Dr. Ganji. However, Mr. Harris went from a marketing representative that referred potential patients, to a glorified owner, manager, leader, and organizer of Allied scheme to defraud medicare. What the Government wants all to believe is that Mr. Harris managed his sister's business.  This is far from the truth!  Harris like, Davis in the Ganji case, offered gift card and incentives.  Davis paid employees referral fees, implemented a contest for her employees to recruit patients. Id. at 774. The Government did not rebut this good-faith defense, and notably charged no one in this case with violating the Kickback Statute. Id. at 774.  So, why is Mr. Harris in prison? Other than he was denied effective assistance of counsel. Strickland, 466 U.S. at 692.

The big to do about Harris moving into his sister's office, and meeting with her behind close doors, does not allude to medicare  fraud. [1]

---

[1]  This Court at sentencing made several findings, that were not objected to by defense counsel.  However, these issues should have been raised on direct appeal.  Still yet, under ineffective assistance of counsel, Mr. Harris is entitled to raise sentencing errors, as well as the Ganji matter before this Honorable Court.  Medicare fraud has specific requirements to enable a conviction.  Even though, Mr. Harris plead guilty. He profoundly request to withdraw his guilty plea, and proceed to trial, because he was denied effective assistance of counsel. The gravity of the issues as raised hereto, brings a complete factual basis for allowing Mr. Harris to withdraw his guilty plea and proceed to trial.

While this case relates profoundly to Dr. Ganji, but is even more grave because Mr. Harris is not a medical provider. His relationship with his sister should not be held again him. (Emphasis Supplied).

Furthermore, as in Ganji, Mr. Harris does not have any medicare training, was not qualified to make diagnosis, and depended on Allied's medical professionals "[o]ne hundred percent" in medical matters. Ganji, 880 F.3d at 775.

How can this be conspiracy to commit medicare fraud? To prove health care fraud, in violation of § 1347, the burden on the Government must show that Mr. Harris knowingly and willfully executed "a scheme or artifice - (1) to defraud any health care benefit program; or obtain, by means of false or fraudulent pretenses, representations or promises," any health care benefit program's money in connection with the delivery of or payment for health care services. Ganji, 880 F.3d at 777. Irrespective of the coerced plea, the coached plea and the threaten plea, there is no evidence to link Mr. Harris to the conspiracy, because he did nothing to bill medicare, or to cause a fraudulent medicare billing.

Only medical professional's can implement erroneous and false medical plans. Further, the signature of the medical professionals must be on the medicare billing. Mr. Harris is not one of them! Antonia Harris admitted that from time to time, she may have forged a medical provider's signature. She is serving 3 years in prison. Mr. Harris labors in

40

prison for 10 years, because he was a marketing person and
received a pay for his services. The Government has no
direct evidence, like in Ganji, that Mr. Harris executed the
fraudulent scheme and fraudulent medicare billing.  Or, that
he was a leader, organizer or manager of this alleged
conspiracy.  Like the movie, "where is the money."  An
agreement also must mean that Mr. Harris would receive some
of the ill-gotten gains.  Mr. Harris only received payments
for his referral and marketing services provided to Allied.

Like in Ganji, for the foregoing reasons, Mr. Harris
must be allowed to withdraw his unintelligent, unknowing,
and involuntary plea. (Emphasis Supplied).  Without this
bogus plea, there is no case again Mr. Harris. (Emphasis
Added).

Like the Ganji case, this matter must be Remanded for a
new trial.

ISSUE NO 4:    THE RESTITUTION ORDER IS ILLEGAL

This issue was raised in the denial of effective
assistance of counsel on appeal.  However, because of the
magnitude of the error, it must be raised hereto in two
fold: (1) denial of effective assistance of counsel; and the
joint and severally restitution order for a health care
fraud case is illegal.

Again,    the fundamental principles of our democracy
is that "within our constitutional framework the legislative
power, including the power to define criminal offenses and
to prescribe the punishments to be imposed upon those found

41

or indirectly, as the result of [a] violation [of a relevant statute]," 21 U.S.C. § 853(a)(1). And the healthcare fraud statute requires district courts to "order the person [convicted of a healthcare fraud offense] to forfeit property, real or personal that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7)

The sister circuit, Eleventh Circuit held that finally, the forfeiture statute for [healthcare-fraud] offenses incorporates many of the drug-law provisions on which Honeycutt relied in rejecting joint and several liability." Sanjar, 876 F.3d at 749 (citing 21 U.S.C. §§ 853(a), 853(e), and 853(p). For example, the Supreme Court stated in Honeycutt" that "[s]ection 853(p) – the sole provision of [section] 853 that permits the [g]overnment to confiscate property untainted by the crime-lays to rest any doubt that the healthcare-fraud provision, provides that "[t]he forfeiture of property under this section ... shall be governed by the provisions of [section 853]." 18 U.S.C. § 982(b)(1). see also id at § 982(b)(2). The healthcare-fraud statute does not permit joint and several liability. Therefore, the restitution order in Elbeblawy was Vacated and Remanded back to the district court to resentence him without the restitution order of $36 million dollars.

Mr. Harris also cannot be held jointly and severally liable in this healthcare-fraud case, based upon precedence of Honeycutt, Elbeblawy, and Sanjar. While this was not

43

raised on his direct appeal, because he was denied effective assistance of counsel. <u>Evitts</u>, 469 U.S. at 388-89; <u>Strickland.</u>, 466 U.S. at 692.

It is prima facie and conclusive that the judgment and sentence order, clearly states "jointly and severally liable for restitution in the amount of $2,418,902.05. Doc 145 at p.6.

In this instant case, the government can only trace to Mr. Harris approximately $250,000.00. <u>Honeycutt</u>, <u>supra</u>; <u>Elbeblawy</u>, supra; and <u>Sanjar</u>, supra.  See also, <u>United States v. Reed</u>, 908 F.3d 102,127 (5th Cir. 2018).

Mr. Harris' Fifth and Sixth Amendment constitutional rights were violated, and the joint and several restitution forfeiture order cannot stand. <u>Id</u>. (Emphasis Supplied),

### FINALITY OF CONVICTION/SENTENCE OR JUSTICE

Federal courts, entrusted with the administration of criminal law and procedures, are often faced with a difficult judgment call choosing between finality and justice, in the words of the Eighth Circuit "[f]or matters not settled it must be recognized that any decision which allows or refuses collateral attack rest upon a choice between achieving finality and assuring substantial justice." <u>Houser v. United States</u>, 508 F.2d 509,513 (8th Cir. 1974). Admittedly, finality is often the easier value to qualify, as it is viewed in terms of efficiency. Justice, gives its focus on notions of fairness, is usually perceived as more difficult to define.  This does not mean, however,

44

that the Court should prefer the former over the latter in
the case before us today. See, e.g., Russell, Reluctant to
Resentence, 91 N.C.J. Rev., at 135 ("A close examination of
the argument favors finality reveals that there is
considerably less justification for treating sentences as
finality compared to convictions.  Court have been
overstating the interest in finality of sentences, and they
should be fixing sentencing mistakes").  But, finality is
not "the central focus of the writ of habeas corpus"
"fundamental fairness is." See, Strickland v. Washington,
466 U.S. 668,687 (1984). Refusing to correct a sentencing
error has resulted in an extra 120 months of expected prison
time ignores that § 2255, like the correlative writ of
habeas corpus, "is, at its core[,], and equitable remedy."
Schlup v. Delo, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.
2d 808 (1995).

Petitioner has been denied his Fifth Amendment right as
guaranteed by the United States Constitution, and the
Constitutional decision of Honeycutt, Elbeblawy, Sanjar,
Strickland, and Evitts clearly supports that the issues as
raised throughout this § 2255 to enhance the Petitioner to
120 months was not constitutional.

For all the reasons argued hereto, Petitioner request
of the Court to correct this injustice of an "120 months"
enhanced sentence in which is not applicable, and Vacate the
120 months sentence and issue an Order to the Bureau of
Prisons (Warden Wilson), that Petitioner's sentence has been

45

corrected to "time served" or "vacated" for new trial proceedings.

The United States Supreme Court in a recent decision in <u>Molina-Martinez v. United States</u>, 136 S.Ct. 1338 (2016) held that sentencing guidelines errors are cognizance under 28 U.S.C. § 2255 collateral review.   (Emphasis Supplied) There are several key issues here, that no longer can be used against Petitioner.

Ultimately, he should be allowed to withdraw his plea and commence these proceeding anew, or the Court should decide in the interest of justice, to release the Petitioner.

<u>CONCLUSION</u>

For the reasons argued hereto, Mr. Charles Harris request of the Honorable Court to Grant him the relief sought of withdrawing his guilty plea, and Vacating the sentence imposed.

**EXECUTED** on this the 3ʳᵈ day of September, 2019 in Fort Worth, Texas pursuant to the penalty of perjury.

Respectfully Submitted,

Charles Harris, pro se
Reg. No. 42637-379
Federal Medical Center
P.O. Box 15330
Fort Worth, Texas 76119

46

## CERTIFICATE OF SERVICE

I hereby state that on this the 16 day of September, 2019 a true and correct copy of the foregoing was hand-delivered to the staff at the institution pursuant to <u>Houston v. Lack</u>, 487 U.S. 266, 270-71 (1988) addressed to the following:

Clerk of the Court
United States District Court
Southern District of Texas
515 Rusk Street, Room 5300
P.O. Box 61010
Houston, Texas 77002

_____
Charles Harris